**FOURTH DIVISION**
**BARNES, P. J.,**
**RAY and MCMILLIAN, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**August 24, 2015**

# In the Court of Appeals of Georgia

A15A0797. BURKE v. THE STATE.

MCMILLIAN, Judge.

Appellant Anthony Bernard Burke was convicted by a jury of aggravated cruelty to an animal (Count 1), giving a false name to a police officer (Count 2), and two counts of influencing witnesses (Counts 3 and 4). He appeals following the denial of his motion for new trial, as amended, arguing that the trial court erred by admitting multiple post-mortem photographs of the animal, a pit-bull bred canine, and that the evidence was insufficient to convict him of the crime of tampering with a witness as charged in Count 3 of the indictment. We find no merit to these contentions and affirm.

Construed to support the jury's verdict,[1] the evidence shows that Burke was the owner of a pit-bull dog named Black Girl. Several of his neighbors, who witnessed him beat the dog to death, testified at trial. David Hudgins, who lived across the street from the house where Burke lived with his girlfriend's family, testified that on December 18, 2008, he saw Burke riding a bicycle toward the house with Black Girl walking beside him on a heavy gauge chain. When he arrived at the house, Burke got off the bike and began beating the dog with the chain while it was still attached to the dog. Burke's girlfriend came out of the house and told him to stop beating the dog, at which point he started beating the dog with a garden hoe, which broke after he hit the dog multiple times in the head. Hudgins testified that the beating lasted seven to ten minutes and that Burke rode away on his bicycle after he stopped beating the dog.

Rebecca Caffee, who lived next door to Burke with her mother and stepfather, testified that on the day in question she had just come home from school and was in the kitchen making something to eat when she heard their dogs barking. She walked out into her yard and saw Burke beating Black Girl with a shovel handle. Rebecca said that Burke realized she was watching him beat the dog and said "what the F are you looking at, I can do to my dog what I want to," so she went back inside. Rebecca

---

[1] *Jackson v. Virginia*, 443 U.S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

testified she saw Burke hit the dog between five and seven times and then the dog moved out of sight. Burke then picked up something else and walked toward the dog, but Rebecca testified she could not see what happened after that point. Rebecca also testified that she asked her mother to call the police when she saw Burke hitting the dog and that after the police arrived she walked over to where Black Girl was lying on the ground. The State showed Rebecca two photographs of the dog, which were marked as State's Exhibits 8 and 9, and she confirmed that the photographs depicted how the dog looked after Burke beat it to death.

Rebecca's mother Samantha Caffee testified that after her daughter told her that Burke was beating the dog, she went outside and saw Burke beating the dog with the "knuckle" of a chain. She called police and repositioned herself after she momentarily lost sight of the dog so she could continue to watch Burke while she was on the phone with 911. She said that while she was watching, she saw Burke pick up a shovel and start beating Black Girl in the head and that the dog was cowering and trying to get away from Burke; her daughter and Hudgins also testified that the dog was hollering, cowering, whining and trying to get away from Burke during the beating. Samatha Caffee said she stayed on the phone with 911 until Burke beat the dog to death, and

she saw Burke get on his bicycle and leave after his girlfriend told him the police had been called.

Officer Darrell Watts with the Macon-Bibb Animal Control was dispatched to the scene, and he called police after he arrived and determined that the dog was dead. Watts said he took pictures of the dog and he identified State's Exhibits 8 and 9 as depicting the dog lying on the ground next to the fence and further testified that State's Exhibit 10, which is somewhat out of focus, depicted blood that was under the dog. He also took a picture of the garden hoe that was used to beat the dog, and that picture was also introduced into evidence at trial. He said after taking the pictures and talking to witnesses, he put the dog in a bag and took it down to the shelter so that a necropsy could be performed.

The City of Macon Veterinarian performed the necropsy of the dog. He testified that his external examination of the dog revealed blood around her ears and blood in her mouth and that State's Exhibits 13, 15, and 17 accurately depicted the cuts, scraps and blood around the dog's ears and on her head, which he had observed during his initial examination of the dog. He then performed a necropsy, which revealed four very large areas of bruising on the dog's skull. The veterinarian testified that the dog's death was caused by blunt trauma to the skull that caused the brain to

4

swell to the point that the reticular activating system, which controls breathing and heart beating, stopped working.

Based on interviews with the witnesses at the scene, a warrant was issued for Burke's arrest. Several weeks later, one of the officers who had been dispatched to the scene stopped a person he suspected was Burke, but the person told him his name was Antwan Burke. The officer took Burke into custody, and Burke later admitted he had given the officer a false name.

1. Burke first contends that the trial court erred by admitting State's Exhibits 8, 9, 10, 13, 15, and 17, which were the post-mortem, pre-necropsy photographs taken of the deceased animal or her blood at the scene and at the animal shelter, arguing that the inflammatory effect of the multiple photographs outweighed their evidentiary worth. The transcript, however, shows that Burke did not object when these exhibits were admitted at trial. Indeed, not only did Burke fail to object when the photographs were initially identified by the witnesses, his counsel specifically stated "no objections" to the admission of the photographs when the State tendered the evidence after the presentation of its witnesses and again stated he had no objection when the photographs went out with the jury. Accordingly, Burke has waived any objection to

5

the admission of this evidence, and this enumeration presents nothing for our review. E.g., *Kirkland v. State*, 315 Ga. App. 143, 147 (3) (726 SE2d 644) (2012).[2]

2. Burke also contends that the evidence was insufficient to convict him of influencing witness Samantha Caffee as charged in Count 3 of the indictment, arguing that evidence failed to show that he made any specific threat to the witness concerning her testimony. However, the crime of influencing a witness does not require that the witness has been specifically threatened. Rather, under OCGA § 16-10-93 (b) (1), and as charged in the indictment, a person commits the offense of influencing a witness when he or she knowingly "use[s] *intimidation*, physical force, *or* threats" to, among other things, influence, delay, or prevent the testimony of any person in an official proceeding. (Emphasis supplied.) Id.

As to this issue, Samatha Caffee testified that Burke came to her house about two weeks after the incident and "said something about the incident. And I said something to him. And he was like, you ain't seen nothing, blah, blah, and kept trying to come up on, to come up." She also said "Ant was pure bouncing around and getting worked up. And he kept trying to come around and my boyfriend kept telling

[2] We note that Burke was tried in 2011; accordingly, the provisions of the new Evidence Code do not apply. See OCGA § 24-1-103.

6

me, just go in the house, I've got this, go in the house." When asked what Burke said about the possibility of her testifying, the witness responded "Well, he didn't really – it wasn't actually spoken as much as it was implied. Basically – in other words, it wasn't you better not but it was like you don't know what you are talking about." She also testified that he told her he was going to tell "them" that she sold pills, and "it was basically trying to intimidate me to where I wouldn't testify."

"The defendant's intent may be inferred upon consideration of the words, conduct, demeanor, motive, and all other circumstances connected with the act for which the defendant is prosecuted." (Citation and punctuation omitted.) *Johnson v. State*, 277 Ga. App. 499, 505-506 (2) (627 SE2d 116) (2006). The jury was authorized to infer from the evidence recited above, which included Burke's menacing physical actions toward the witness as well as a threat to tell law enforcement that she was engaged in criminal activity, coupled with other evidence presented at trial such as the fact that Burke made specific threats to Hudgins,[3] that Burke acted with the requisite intent to intimidate Samatha Caffee so that she would

---

[3] Hudgins testified that Burke came to his house one day and made statements about getting Samatha Caffee in trouble for selling pills and told Hudgins that if he showed up in court, "somebody might ride by and shoot at your house and somebody might burn your house down."

7

not testify against him at trial. "Where, as here, there is at least some circumstantial evidence from which the jury could infer that [the defendant knowingly intimidated the witness,] we will not second-guess the jury and reverse the defendant's conviction." Id. at 507 (2); *Carter v. State*, 237 Ga. App. 703, 708 (516 SE2d 556) (1999) (defendant's menacing presence on victim's property sufficient to show he indirectly communicated a threat so as to authorize his conviction for influencing a witness).

*Judgment affirmed. Barnes, P. J., and Ray, J., concur*.